UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **PRESTON EXPLORATION CO., et al.,** | § | |
| | § | |
| Plaintiffs, | § | |
| vs. | § | **CIVIL ACTION NO. H-08-3341** |
| | § | |
| **CHESAPEAKE ENERGY CORP., et al.,** | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM AND ORDER

Before the Court is the Motion to Alter Judgment of Plaintiffs Preston Exploration Company, L.P., PEC Partnership, T.S.C. Oil & Gas, Inc., and Frank Willis, III (collectively "Preston") (Doc. No. 50). Preston seeks withdrawal of this Court's November 3, 2009 Memorandum and Order granting Defendants Chesapeake Energy Corporation and GSF LLC's (collectively "Chesapeake") Motion for Summary Judgment (Doc. No. 13), and denying Preston's Cross-Motion for Summary Judgment (Doc. No. 19) (the "Order"). (Doc. No. 44.) After reviewing the filings, the relevant law, and the parties' oral arguments, the Court finds, for the reasons discussed below, that Preston's Motion to Alter Judgment should be granted in part.

### I. FACTUAL BACKGROUND

This is a dispute regarding an agreement to assign certain oil and gas leases. In June, 2008, Chesapeake's CEO, Aubrey McClendon, approached Preston proposing to purchase oil and gas leases covering roughly 6,600 acres of land owned by Preston in Harrison and Panola Counties, Texas. The parties engaged in discussions and negotiations, during which Preston sent Chesapeake several schedules and exhibits describing the leases that were to be conveyed. On October 6, 2008, Chesapeake

requested that the closing, then scheduled for the following day (October 7), be postponed. Preston agreed to postpone closing until November 7, 2008. On October 7, 2008, Preston sent Chesapeake emails with several attachments in response to Chesapeake's request for the final schedules and exhibits. That same day, Chesapeake received copies of the PSAs signed by Preston. Chesapeake signed the PSAs on October 8, 2008, and paid a 10% deposit pursuant to these agreements. The PSAs, executed on October 8, 2008, contemplated a $99 million purchase price and a November 7, 2008 closing date.

On November 3, Chesapeake inquired whether Preston would accept part of the purchase price in cash and part in Chesapeake stock. Preston responded that it would not, and moved forward with preparations for closing. On November 6, 2008, Chesapeake informed Preston that it would not be attending the closing. Preston brought this lawsuit alleging breach of contract and seeking specific performance of the PSAs and damages. In the Order, this Court granted Chesapeake's motion for summary judgment and found that the PSAs were unenforceable under the statute of frauds. Preston now moves to alter and amend this judgment, alleging that the Court committed manifest errors of law.

## II. LEGAL STANDARD

A motion to alter or amend judgment is governed by Federal Rule of Civil Procedure 59(e). *Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 n.1 (5th Cir. 2004). Such a motion must "clearly establish either a manifest error of law or fact or must present newly discovered evidence. These motions cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005) (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th

Cir. 1990)). In considering a motion for reconsideration, a court "must strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993).

## III. ANALYSIS

### A. Enforceability of the PSAs under the Statute of Frauds

#### 1. Sufficiency of Exhibit A to the PSAs

Preston argues that the Court committed manifest errors of law, particularly in light of newly acquired evidence, in ruling that the PSAs are unenforceable under the statute of frauds. In order to comply with the statute of frauds, a contract purporting to sell or assign oil and gas leases "must furnish within itself, or by reference to some other existing writing, the means or data by which the [property] to be conveyed may be identified with reasonable certainty." *Long Trusts. v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006). "Extrinsic evidence may be used only for the purpose of identifying the [property] with reasonable certainty from the data contained in the contract, not for the purpose of supplying the location or description of the [property]." *Id.* (internal quotations omitted).

Preston first argues that, as set forth in Preston's previous summary judgment brief, each of the three Exhibit As attached to the PSAs contained more than enough identifying information for each lease to comply with the statute of frauds. The Court, however, held in its Order that the "descriptions of the property contained in Exhibit As to the PSAs do not sufficiently identify the leaseholds with certainty." (Order at 5 (citing *Long Trust v. Griffin*, 222 S.W.3d 412 (Tex. 2006).) In oral argument on its Motion to Alter Judgment, Preston presented a comparative chart demonstrating how the identifying

information provided in Exhibit As to the PSAs far exceeds the descriptions at issue in *Long Trust*. On this basis, Preston asserts that this Court's reliance on *Long Trust* was misplaced.

In *Long Trust*, the court held that agreements for the purchase and sale of oil and gas leases were unenforceable under the state of frauds because the leases to be conveyed were not sufficiently identified. *Id.* at 417. Turning then to the precise information before the court in that case, it appears that the *Long Trust* contracts included Exhibits As containing the lessor name, the survey name, the term, and the net acreage for each lease at issue. *Long Trust*, 222 S.W.3d at 416. Subsequent documents executed by the parties added no clear identifying information for the properties. *Id.* In contrast, the Exhibit A PSAs at issue in this case additionally provide the name of the lessee, the effective date of the lease, the gross acres leased, the royalty of the lease, and the net revenue interest in the property. Preston maintains that, with this information, one could identify each and every lease to be conveyed with nearly absolute certainty and relative ease. Chesapeake, however, maintains that these PSAs suffer from the same deficiency as those at issue in *Long Trust*, namely that the Exhibits As fail to identify the precise location or the boundaries of the leases being conveyed.

While the Court recognizes that this is an extremely close call, and Preston has certainly argued its case well, the Court must nonetheless stand by its holding that the Exhibit As to the PSAs do not satisfy the statute of frauds because they fail to provide the location of the leases. While it may be true, as Preston argues, that a person could determine with absolute certainty the leases being conveyed through the information provided in the Exhibits and reference to public records, Texas law explicitly holds that

extrinsic evidence may not be used for the purpose of supplying the location of the property. *Long Trust*, 222 S.W.3d at 416. While the Court understands that an overly technical and formulaic application of the statute of frauds does nothing to further the purpose for which it was created, it nonetheless must hold that location information remains vital to the legitimacy of a conveyance in real property. *See Reiland v. Patrick Thomas Properties, Inc.*, 213 S.W.3d 431, 437 (holding that the legal description in the conveyance must contain information of the size, shape, and boundaries, and not just the general area of the conveyance (citing *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972)).[1] Were there any indications of the actual location of the acreage corresponding to each lease, this Court would certainly agree that these Exhibits are statute of frauds compliant. Because this information is not included, however, we hold that we committed no manifest error of law in holding that Exhibit As to the PSAs do not comply with the statute of frauds.

### 2. Significance of Exhibit As to the Assignments

Preston also argues that, regardless of any deficiencies to the PSA Exhibit As, the Court's Order was erroneous in light of newly acquired deposition testimony which demonstrates that final Exhibit As to the Assignments, which included recording information for each lease, formed part of the agreement between the parties upon signing the PSAs. Because these Exhibits constituted part of the parties' agreement and

---

[1] Preston supplemented its Motion with a recent case decided by a Court of Appeals of Texas: *Wiggins v. Cade*, --- S.W.3d ---, 2010 WL 325770 (Tex. App.—Tyler 2010). There, the court held that a fact issued remained as to whether the description of land conveyed in two royalty deeds was sufficient under the statute of frauds. *Id*. at *4. In doing so, the Court reasoned that "[a]n individual can use parol evidence to connect data described in an instrument . . . to establish sufficiency of a legal description." *Id*. However, Chesapeake rightly points out that *Wiggins* primarily involved the *sufficiency* of the metes and bounds description in a contract, and was not a case in which no metes and bounds were provided at all. Thus, to rely on *Wiggin*s to validate the contracts at issue here would be an improper extension of its holding, and a distortion of the statute of frauds.

understanding prior to signing, argues Preston, they render the PSAs statute of frauds compliant. Chesapeake concedes that it did receive the Exhibit As to the Assignments as part of the package of schedules and final exhibits to the PSAs sent via email, which it reviewed the day before signing the contracts. However, the parties remain in dispute on two issues: first, whether the Assignment Exhibit As which were sent had been finalized such that they can be considered mutually agreed upon, and second, if they were finalized, whether they have any legal significance vis-à-vis the PSAs.

### i. Were the Assignment Exhibit As finalized?

The Court acknowledges that, if the Assignment Exhibits As were not yet finalized at the time when the PSAs were signed, they cannot, under basic principles of contract law, be considered part of the parties' mutual agreement. Preston presents deposition testimony that does in fact confirm that, shortly before signing the PSAs, Chesapeake received a "package," or an email with several attachments, that included the Assignment Exhibit As with recording information. (Rudy H. Sims, Jr. Dep., Pl. Mot. Ex. 1, Doc. No. 50-3, 139:22-25, 153:11-23, Oct. 20, 2009). Chesapeake's witnesses maintained, however, that they did not consider these Assignment Exhibit As to be final, and anticipated that they would change before delivery at closing. (Sims Dep., 15:4-20; Michael Falen Dep., Pl. Mot. Ex. 3, Doc. No. 50-5, 153:19-154:12, Oct. 22, 2009.)

The parties vigorously disputed this point during oral argument. Chesapeake maintained that, at the point at which the PSAs were presented to them for signature, they had not yet finalized precisely which leases were to be conveyed at closing, and thus the Assignment Exhibit As could in no way be said to have been finalized. Portions of the presented deposition testimony are consistent with the notion that, to the extent that

Chesapeake's witnesses reviewed the Assignment Exhibit As at all, it was with the understanding that they *may* be altered or changed before closing. (Sims Dep. 156:8-16; Falen Dep. 161:5-19.)

Preston, on the other hand, insisted that the Assignment Exhibit As presented to Chesapeake for their approval were no longer subject to any negotiation. Preston argued that the parties had identified, in these Assignment Exhibits, each and every lease that was going to be conveyed at closing, and were proceeding with the mutual understanding that, as long as Preston in fact owned the leases listed in the Assignment Exhibits As, they were obligated to convey them to Chesapeake at closing. As further evidence of this, Preston points out that the list of leases presented as Exhibit As to the Assignment were nearly identical, and included the same leases, as the Exhibit As to the PSAs. The only significant difference was that the Exhibit to the Assignments included the recording information. This contention also finds support in the deposition testimony of Chesapeake's witnesses. (Sims. Dep., 154:11-21; Falen Dep., 148:13-152:21.) Thus, according to Preston, the only way in which the leases listed in the Assignment Exhibit As sent to Chesapeake the day before it signed the PSAs could have changed would be through the title examination and curative process, a routine condition subsequent that does not render agreements to convey real property unenforceable under the statute of frauds. No other negotiations remained as to the agreement between the parties. Finally, Preston points out that the Exhibit As to the Assignments sent to Chesapeake on the day the PSA was signed signaled that the parties had an "agreement" as to the specific obligations of each party, and not a "generalized understanding." This contention is

somewhat corroborated by the deposition testimony (Sims Dep., 153:11-23; 160:22-161:8; Falen Dep., 163:19-162:2.)

In light of these competing arguments, each finding support in the newly presented testimonial evidence, the Court finds that a fact issue remains as to the whether the circumstances under which the Exhibit As to the Assignments were sent to Chesapeake for its review prior to signing the PSAs demonstrate that the Assignment Exhibit As were, in fact, finalized or mutually agreed upon. In so finding, the Court notes that, if the only basis on which the leases in the Exhibit As to the Assignment sent to Chesapeake prior to signing the PSAs might have changed was that Preston did not in fact own the leases, this would not render the Assignment As "un-finalized" such that they would be categorically excluded from the terms of the parties' agreement. However, if the evidence shows that the Exhibit As to the Assignments, or the properties to be exchanged at closing, could have changed or were subject to negotiation in *any other* material way between the signing of the PSAs and the scheduled closing date, these Exhibits cannot be said to have been final.[2]

### ii. What is the legal significance of the Exhibit A Assignments?

Regardless of whether the Assignment Exhibit A's were finalized, a separate issue remains as to whether this would have any impact upon the validity of the PSAs. In oral

---

[2] The Court notes that the question of whether the Exhibit As to the Assignment were finalized would also have some bearing on the issue of whether, should the contracts be unenforceable, Preston is nonetheless entitled to some form of relief under a theory of promissory estoppel. The Court based its rejection of Preston's argument on the fact that Preston failed to show that Chesapeake promised to "sign a document that had already been prepared or 'whose wording had been agreed upon'" that would satisfy the statute of frauds." (Order at 8 (citing *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 29 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).) Undoubtedly, were a fact-finder to determine that the Exhibit As to the Assignments had in fact been finalized, the Court's finding and holding would accordingly change.

8

argument, Chesapeake argued that, even if it did receive final Exhibit As to the Assignments with the proper recording information prior to signing the PSAs, the fact remains that these Assignment Exhibit As were in no way attached to the PSAs as executed. Therefore, argues Chesapeake, these Exhibits were simply not part of the agreement when "pen touched paper." Preston, however, maintained in its oral presentation that these Assignment Exhibits were part of the agreement between the parties, because they were sent to Chesapeake via email, with the Exhibit As to the PSAs, as part of the "final set of exhibits and schedules" to be reviewed by Chesapeake prior to signing the PSAs. Preston maintains that it is "disingenuous" for Chesapeake to say that these papers should be entirely excluded from the real property agreement simply because they were not physically stapled to the copy of the PSAs that were handed to Chesapeake on the day that the emails containing the exhibits were sent. Thus, according to Preston, the scope of the contracts should not be defined by the physical papers that were stapled together at any given moment, because it was the understanding of the parties that all the documents sent in connection with the agreement prior to the signing of the PSAs were agreed upon and finalized, excepting the title curative process.

Generally, a contract for the sale of property may consist of more than one writing. In the Fifth Circuit, in order for the unsigned writing to be used to supply certain terms of the contract, there must be some reference to that writing in the signed writing. *Minsky's Follies of Fla., Inc. v. Sennes*, 206 F.2d 1, 4 (5th Cir. 1953). However, courts have also found that separate writings that are related in subject matter may be read together to satisfy the statute of frauds if they are "so connected with each other" that they may be fairly said to constitute one paper relating to the contract. *Joseph E. Seagram*

*& Sons, Inc. v. Shaffer*, 310 F.2d 668, 674 (10th Cir. 1962); *see also Boswell v. Rio De Oro Uranium Mines, Inc.*, 362 P.2d , 995 (N.M. 1961) (holding that a memorandum sufficient to satisfy the statute of frauds need not be contained in a single writing, but may consist of several writings if "it appears from examination of all the writings that the signed writing was signed with reference to the unsigned writing"); *Haspray v. Pasarelli*, 380 P.2d 919, 921 (Nev. 1963) (holding that "[t]wo separate writings may be sufficiently connected by internal evidence without express words or reference of one to the other" if it appears from the subject matter and from the nature of the terms that they refer to the same transaction and state the terms thereof); *Crabtree v. Elizabeth Arden Sales Corporation*, 305 N.Y. 48, 54 (N.Y. 1953) (holding that the statute of frauds does not require that the contract be in one document, and it may be pieced together out of separate writings, "connected with one another either expressly or by the internal evidence of subject-matter and occasion"); RESTATEMENT (SECOND) OF CONTRACTS § 132 (1981) ("The memorandum [satisfying the statute of frauds] may consist of several writings if the circumstances clearly indicate that they relate to the same transaction.); *but see Owen v. Hendricks*, 433 S.W.2d 164, 166-67 (Tex. 1968) (holding that unsigned papers may be considered part of a memorandum for purposes of the statute of frauds only when the signed paper at the time of the signature can be shown from its contents to be based on an adoption of a then existing unsigned paper).

While none of these cases is exactly on point factually, or even controlling authority, their holdings nonetheless strongly suggest that an overly rigid and antiquated application of the statute of frauds is undesirable and could undermine the purposes for which the statute was created. The evidence in this case demonstrates that, for each of the

leases listed in the Exhibits As to the PSAs that were physically attached to the contracts, Chesapeake had received, viewed, and had in it possession the precise recording information immediately prior to signing its name. (Sims Dep., 154:11-21; Falen Dep., 148:13-152:21.) That the single factor separating what this Court can and cannot consider in evaluating the validity of the PSAs is what was held together by a staple at the moment they were signed, is, in the opinion of the Court, an impractical and absurd application of a rule that is based on practical concerns. Indeed, what Chesapeake returned to Preston indicating its assent to be bound by their agreement was only the signature page of the PSAs, without any of the other pages physically attached to it, further reinforcing the insignificance of whether the papers were or were not physically connected. Furthermore, Chesapeake's own witness admitted that, at the time he signed the PSA signature page, thereby executing the agreement, he did not even look at the other pages attached to it, as he assumed that all relevant documents had been reviewed by his colleague and were agreeable. (Douglas J. Jacobsen Dep., Pl. Mot. Ex. 2, Doc. No. 50-4, 81:4-14, Oct. 21, 2009.) This further suggests that the physical papers that were stapled together at the moment that "pen touched paper" should, perhaps, not be given dispositive legal significance.

      As such, the Court concludes that the Exhibit As to the Assignments are not per se excluded from the agreement, simply because they were not stapled to the copy of the PSAs when they were physically handed over to Chesapeake. Particularly in an age where contractual agreements have become increasingly lengthy, and email, rather than the physical exchange of letters, has become the more efficient and preferred method of communication, adherence to an overly rigid and antiquated notion of contract law and

the statute of frauds is both futile and contrary to the statute's purpose. Chesapeake concedes that Exhibit As to the Assignments were sent to them on the day that the PSAs were executed by Preston, in an email that also contained Exhibit As to the PSAs themselves, and in response to Chesapeake's requests for the "final schedules and exhibits". (Sims Dep., 153:11-16; 160:22-161:8.) Chesapeake does not dispute that it had the opportunity to fully review these documents, including the recording information contained therein, immediately prior to signing the PSAs. In essence, these Exhibits were part of the "package" of information that Chesapeake was made aware of and had in its possession prior agreeing to purchases the leases. Newly presented evidence has demonstrated to the Court a remaining fact issue as to the degree of finality within the Exhibit As to Assignments that were sent to Chesapeake for its review. However, this Court is persuaded that, provided they were sent to Chesapeake under factual circumstances suggesting that both parties understood them to be finalized documents, these Exhibits would constitute part of the agreement to which the parties subsequently signed their names.

Therefore, the Court holds that its previous order granting Chesapeake summary judgment on the issue of whether the PSAs complied with the statute of frauds must be amended. The Court now finds that a fact issue remains as to whether the Assignment Exhibit As were finalized. If a fact-finder determines that they were, the PSAs must be enforced.

### B.     Partial Performance Exception

The Court now turns to whether its holdings with regard to exceptions to the statute of frauds should likewise be altered, in the event that subsequent factual findings

demonstrate that the PSAs do not comply with the statute of frauds. Preston argues that the Court committed manifest error, particularly in light of newly acquired evidence, in ruling that the partial performance exception to the statute of frauds does not apply to this case. "Under the partial-performance exception to the statute of frauds, a court may enforce an oral contract that has been partially performed if enforcement is necessary to prevent a virtual fraud." *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 276 (5th Cir. 2009) (citing *Exxon Corp. v. Breezevale Ltd.,* 82 S.W.3d 429, 439 (Tex.App.—Dallas 2002, pet. denied).

Preston correctly states that this exception to the statute of frauds applies where the partial performance is "unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App.—Dallas 2002, pet. denied). "The acts of performance relied upon to take a parol contract out of the statute of frauds must be such as could have been done with no other design than to fulfill the particular agreement sought to be reinforced." *Id*. According to Texas courts, the elements necessary to relieve a contract for the sale of real property from the statute of frauds include: "(1) payment of the consideration; (2) surrender of possession; and (3) the making of valuable and permanent improvements on the land with the owner's consent." *Chambers v. Pruitt*, 241 S.W.3d 679, 687 (Tex. 2007) (finding that, although buyer made a down payment on the land, there is no evidence she paid the full purchase price). Preston does not meet its burden of showing that this Court committed manifest errors of law by invoking in its Order the indicia of

partial performance in the context of real property. None of the new testimonial evidence offered by Preston suggests that these indicia are present in this case.[3]

Furthermore, Preston's argument that "there was no reason for Chesapeake to pay the deposit and submit title defects other than to fulfill the express provisions of the PSAs," and the evidence suggesting that Chesapeake intended to close the deal misses the mark. (Pl. Mot. at 3.) Preston's contentions may have been dispositive in the case of an invalid agreement for something other than the sale for real property, however they cannot remedy the particular deficiencies at issue here. Here, it is undisputed that both parties believed, at least for some time, that they had a valid and enforceable contract. (Sims Dep. 173:23-174:4, 179:4-10.) That Chesapeake took actions in accordance with this belief does not satisfy the potential deficiency of this particular real property contract under the statute of frauds—namely that the property to be transferred at closing was not sufficiently described. It is precisely for this reason that a body of law focusing on indicia of partial performance in the particular context of real property has developed—partially performing actions that might suffice to render enforceable an oral contract for services or goods may be irrelevant to the validity of a *real property* contract wherein property is not adequately described.

---

[3] However, Preston is correct that these indicia have generally been applied in contexts where it is the purchaser seeking to enforce an agreement. A seller may be entitled to enforce an invalid written agreement if he shows "performance of the contract by delivery of possession to the purchaser and a detrimental change of position, for which the vendor has no adequate remedy." *Davis v. Campbell*, 524 S.W.2d 790, 793 (Tex. Civ. App.—Dallas 1975, no writ.). While Preston suggests in its original Motion for Summary Judgment that it detrimentally changed it position in reliance on the contract because it lost out on the ability to sell the property to other prospective buyers and "in fact turned out at least one other offer," it provides no evidence of this detrimental reliance. (Doc. No. 19 at 14.) Furthermore, there was no delivery of possession of the leases. Therefore the particular indicia of partial performance in cases where a seller seeks to enforce an agreement do not exist here.

As to the issue of virtual fraud, Preston argues that the Court erroneously suggested in its Order that failure to enforce this agreement would not result in "virtual fraud." Virtual fraud "arises when there is strong evidence establishing the existence of an agreement and its terms, the party acting in reliance on the contract has suffered a substantial detriment for which he has no adequate remedy, and the other party, if permitted to plead the statute, would reap an unearned benefit." *Exxon Corp.*, 82 S.W.3d at 439. It its Order, the Court found that that "an unfavorable change in the market price beyond the control of either party does not amount to fraud." (Order at 7.)

Preston argues that new evidence now shows that "Chesapeake engaged in a concerted effort to tie up leases and keep sellers like Preston from being able to sell to other potential purchasers by pushing back closing . . . and then later denying that there was ever a binding agreement at all" when the market value of the properties dropped. (Pl. Mot. at 15.) While recognizing that Preston exaggerates the thrust of the testimonial evidence, the Court does consider the new evidence to have some bearing on the issue of fraud. First, the deposition testimony constitutes "strong evidence of the existence of an agreement and its terms," as it is now clear that Chesapeake had the recording information for the leases included in the PSAs prior to signing the documents. Secondly, there is also some evidence that Chesapeake would reap an unearned benefit by pleading the State of Frauds. The unenforceability of the document that both parties believed was enforceable would imply that Chesapeake essentially gained an option to buy certain oil and gas leases from Preston at no cost and no risk, which it then refused to exercise in light of the drop in the market value of the leases. Preston has, however, presented no evidence as to the final element, that it suffered a substantial detriment for which it has

15

no adequate remedy *as a result* of its reliance on the contract. While Preston mentions several times that it lost the ability to sell the leases to other purchasers in the time between the execution of the PSAs and the scheduled closing, it presents no evidence of particular actions it took or other offers it refused in reliance of Chesapeake's representations that it intended to close.[4] This lack of evidence, combined with the fact that Preston has not demonstrated the indicia of partial performance in the context of real property, indicates that the Court committed no manifest error of law on the issue of partial performance.

### C. Promissory estoppel

Preston contends that the Court committed manifest error, particularly in light of newly acquired evidence, in ruling that the promissory estoppel exception to the statute of frauds does not apply. The Court based its rejection of Preston's argument on the fact that Preston failed to show that Chesapeake promised to "sign a document that had already been prepared or 'whose wording had been agreed upon' that would satisfy the statute of frauds." (Order at 8 (citing *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 29 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).) Preston's Motion argues that "missing entirely from the Court's analysis are the Exhibit As to the Assignments which were agreed upon by the parties . . . ."

Because the Court has now found that there remains a fact issue as to whether the Exhibit As to the Assignments were in fact agreed upon and finalized, the Court's

---

[4] Preston's single comment in its Motion for Summary Judgment that it "turned down at least one other offer" for the leases is insufficient. No evidence is presented as to who made the offer, whether the offer was for the same leases that were to be conveyed to Chesapeake, when the offer was made, or the terms of the offer. This single, unsubstantiated assertion does not amount to a showing that Preston suffered substantial detriment as a result of its reliance on the agreements with Chesapeake.

16

previous holding and analysis can no longer stand. If the fact-finder determines that the Assignment Exhibit As were not finalized, then, under the Court's previous analysis, promissory estoppel would be foreclosed. However, were the fact-finder to determine that the Exhibit As to the Assignments were finalized such that Preston might qualify for relief under promissory estoppel, the Court would, under the analysis above, necessarily hold as a matter of law that the contracts are compliant with the statute of frauds and enforceable, thereby making any promissory estoppel analysis unnecessary. As such, Preston's promissory estoppel argument is now moot, and need not be considered.

`        **D.      Reformation**

Preston argues that this Court committed a manifest error of law by not granting Preston the right to reform the PSAs to bring them in compliance with the statute of frauds. The Court considers this argument in the event that, after the determination of the fact-finder, the PSAs are held unenforceable. Reformation is intended to correct a mutual mistake made in preparing a written instrument so that the instrument reflects the original agreement of the parties. *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 380 (Tex. 1987). Preston avers that it is entitled to reformation of the contract because "[t]o the extent the parties were mutually mistaken in their belief that Preston's leases were sufficiently described to be enforceable under the statute of frauds, reformation is appropriate." (Pl. Mot. at 18.) Preston presents much testimonial evidence that demonstrates that both Chesapeake and Preston believed that the PSAs were enforceable and intended to close on the deal upon signing.

However, Preston's argument improperly conflates mutual mistakes as to the *content* of the agreement with mutual mistakes as to *enforceability*. That the parties were

17

mistaken as to the legal significance of their agreement is not the same as saying that they were mistaken as to the actual contractual terms. *National Resort Communities, Inc. v. Cain*, 526 S.W.2d 510 (Tex. 1975); *see also Rocanville Corp. v. Natural Gas Pipeline Co. of America*, 823 F.2d 92, 94 (5th Cir. 1987) (holding that in order for a contract to be eligible for reformation, the mutual mistake "must concern the terms of the contract itself, not some other feature of the transaction"). Preston is not arguing that the parties inadvertently neglected to include the boundaries or recording information from the PSA Exhibits. Instead, Preston produces evidence to demonstrate that both parties thought that the agreed terms of the PSAs were enforceable. This mistake does not warrant reformation because, as Chesapeake points out, such an exception would "obliterate the statute of frauds." (Def. Resp. at 13.) Therefore, the Court does not find that it erred in its rejection of Preston's claim for reformation.

### E.     Unclean hands

Finally, Preston avers that the Court committed manifest error, particularly in light of newly acquired evidence, in ruling that Preston is not entitled to summary judgment on Chesapeake's claim for money had and received, that is, the 10% deposit it paid to Preston, in the event that the PSAs cannot be enforced. The "unclean hands" doctrine "'closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief . . . .'" *ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 330 (U.S. 1994) (citing *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1954)). Preston correctly points out that the Court's rejection of its "unclean hands" argument was premised on the fact that, because the PSAs were unenforceable, Chesapeake was legally justified in

repudiating and did not act unfairly. In the Order, the Court found that Preston's evidence as to Chesapeake's unfair behavior was insufficient to meet the summary judgment standard. (Order at 10.) Preston now presents further evidence that it claims definitely proves that Chesapeake made a concerted effort to "retrade" and "renegotiate" its existing agreements with an eye toward later asserting that the agreements were unenforceable. (Pl. Mot. at 25.)

In evaluating the testimonial evidence, the Court finds that the reasons behind Chesapeake's decision not to close on the PSAs remain ambiguous. It is not indisputably clear whether Chesapeake realized prior to the scheduled closing that the PSAs were unenforceable, or whether it chose not to close and then asserted the unenforceability of the contracts as a way to avoid its obligations. While Chesapeake stated in oral argument that the decision not to close was motivated by financial concerns, deposition testimony is far less clear on this point. (Sims Dep. 171:18-174:11; Douglas J. Jacobson Dep., Pl. Mot. Ex. 2, 104:24-105:17, 108:1-15, Oct. 21, 2009.) As such, there continues to be a fact issue as to whether Chesapeake acted in good faith during its negotiations with Preston. The Court did not, therefore, commit error in finding that Preston was not entitled to summary judgment as to Chesapeake's counterclaim for restitution. This issue of whether Chesapeake acted in good faith must go before a fact finder.

## IV. CONCLUSION

The Court's reexamination of the law and facts presented in the parties motions for summary judgment, combined with the newly presented testimonial evidence, has persuaded the Court that its Order cannot stand in its entirety. For the above stated

reasons and in accordance with the Memorandum above, Preston's Motion to Amend or Alter Judgment (Doc. No. 50) is hereby **GRANTED IN PART.**

There remains an outstanding motion for leave to designate responsible third party filed by Chesapeake, which should be addressed as expeditiously as possible. (Doc. No. 84). Accordingly, a motion hearing will held on Friday, February 19 at 11:00 am to take up this and any other outstanding issues.

**IT IS SO ORDERED**.

**SIGNED** this 16th day of February, 2010.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE