# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **PRESTON EXPLORATION CO., et al,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **VS.** | § | **CIVIL ACTION NO. H-08-3341** |
| | § | |
| **CHESAPEAKE ENERGY CORP., et al,** | § | |
| | § | |
| **Defendant.** | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The parties in this case are Plaintiffs Preston Exploration Company, L.P., PEC Partnership, T.S.C. Oil & Gas, Inc., and Frank Willis, III (collectively "Preston"), and Defendants Chesapeake Energy Corporation and GSF, LLC (collectively "Chesapeake"). This case was tried to the Court on March 22, 23, and 24, 2010. Both parties have since submitted post-trial briefing. Pursuant to Federal Rule of Civil Procedure 52, the Court's Findings of Fact and Conclusions of Law are set forth below. The Court will first take up several legal issues that the parties urged it to reconsider, or to consider for the first time, during trial.[1] The Court will then set forth its findings of fact and conclusions of law as to the particular factual issues on which trial evidence and testimony were focused.

---

[1]    The Court raised the question at trial of whether it could revisit issues upon which it had already ruled pursuant to the parties' Motions for Summary Judgment. Preston argues that it is appropriate to revisit these issues because the Court's rulings were not final judgments under FED. R. CIV. P. 54(b), but rather rulings issued pursuant to Rule 56(b). "A partial summary judgment order in accordance with Rule 56(d) is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case. Such an order is interlocutory in nature, is subject to revision by the district court, and has no *res judicata* effect." *F.D.I.C. v. Massingill*, 24 F.3d 768, 774 (5th Cir. 1994) (citing cases). Nonetheless, the ability of a district court to modify a partial summary judgment order is subject to the requirement that the parties be given the opportunity to present additional evidence on the issue. *Id.* (noting that the district court did request additional authorities from the parties concerning the issue it wished to revisit and asked whether there was anything else they wished to present).

Accordingly, the Court has allowed both parties to submit briefs to further argue several issues previously considered by this Court. In these submissions, the parties have raised arguments that, to this Court's understanding, were not made or not fully developed during previous summary judgment briefing. Because both sides have been permitted to submit briefs and responses addressing a myriad of new legal

I.    **WHETHER THE PSAs, AS EXECUTED, COMPLIED WITH THE STATUTE OF FRAUDS**

First, Preston asks this Court to reconsider its previous holding as to whether the information contained within the Purchase and Sale Agreements and the Exhibits attached thereto is sufficient to render the agreements statute of frauds compliant.

A.    **Was the Information contained in the PSA Exhibits Statute of Frauds Compliant?**

Preston re-urges its previous argument that the information contained within the PSA Exhibits is sufficient to comply with the statute of frauds. This Court considered this question in two previous Orders. (Mem. & Orders, Doc. Nos. 44, 93.) In its Order on Preston's Motion to Alter or Amend Judgment (Doc. No. 93) ("February 2010 Order"), the Court held that the Exhibits to the PSAs do not satisfy the statute of frauds because they failed to disclose the location and boundaries of the properties corresponding to the leases to be conveyed. (February 2010 Order at 4.) The Court noted that, under Texas law, extrinsic evidence may not be used for the purpose of supplying the location of the property in question. (*Id.*)

1.    **Data contained in the PSA Exhibits**

Preston argues that, under Texas law, all that is required to satisfy the statute of frauds is a description that identifies the property to be conveyed with reasonable certainty. *See Long Trusts. v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006). Preston points out that the PSA Exhibits include general location information, the acreage of each property, and various other descriptive data. According to Preston, this information is

---

arguments raised during trial, the Court reasons that neither will be prejudiced by the Court's consideration of these arguments. At this stage, even those arguments which were newly raised at trial have been briefed by both sides. Moreover, this Court heavily favors addressing all legal theories on the merits, rather than precluding them altogether on the basis of procedural deficiencies, particularly at this stage wherein the Court now has a fully developed factual record from which to draw.

more than sufficient for purposes of the statute of frauds because, with such data, public records could be consulted and each lease to be conveyed could be identified with more than reasonable certainty.

The Court is, once again, unpersuaded by Preston's argument. Preston correctly points out that the identifying information for each lease set forth in the PSA Exhibits is more descriptive than that in the case of *Long Trusts*.[2] Chesapeake does not appear to dispute this point. However, while the Exhibits in this case allow the leases to be conveyed to be identified with more certainty than those in *Long Trusts*, this does not change the fact that the data here, like that in *Long Trusts*, require a search of the public records in order to arrive at the location of the property that corresponds to each lease. As this Court has noted several times, a description cannot be sufficient when it requires a surveyor to review real property records to identify the property being conveyed. *See Long Trusts*, 222 S.W.3d at 416 (extrinsic evidence may not be used to supply the location information of the property); *Reiland v. Patrick Thomas Properties, Inc.*, 213 S.W.3d 431, 437-38 (Tex. App.—Houston [1st Dist.] 2006). Public real property records, surveys, and similar documents can be considered only if they are attached to or referenced in the contract. *Cheetah Gas Co. v. Chesapeake Louisiana, L.P.*, 2009 WL 416324, at *2 (S.D. Tex. Feb. 19, 2009) (citing *Reiland*, 213 S.W.3d at 437-38). Regardless of the certainty with which a surveyor could locate the property upon consulting public records, the fact remains that the PSA Exhibits require consultation of

---

[2] In *Long Trusts*, the court held that agreements for the purchase and sale of oil and gas leases were unenforceable under the statute of frauds because the leases to be conveyed were not sufficiently identified. *Id.* at 417. Turning to the precise information before the court in that case, it appears that the *Long Trusts* contracts included Exhibits As containing the lessor name, the survey name, the term, and the net acreage for each lease at issue. *Id.* at 416. Subsequent documents executed by the parties added no clear identifying information for the properties. *Id.* In contrast, the PSA Exhibits at issue in this case additionally provide the name of the lessee, the effective date of the lease, the gross acres leased, the royalty of the lease, and the net revenue interest in the property. (*See* Pl. Exs. 27, 83, 84.)

some extrinsic authority to discern the location of the leases. The data set forth within the PSAs do not inherently contain such identifying information.

By contrast, had the volume and page number information for each of the leases been included in the PSA Exhibits, this would have constituted an explicit reference to the public records containing the required location information. This distinction between characteristic data versus volume and page information is crucial, because the latter comports with the general rule that, in order to be statute of frauds compliant, "a writing must furnish within itself or by reference to some other existing writing, the means or data by which the land to be conveyed may be identified with reasonable certainty." *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972). Characteristic data, however, are not thus compliant. Therefore, the Court must reject Preston's contention that, if volume and page would be sufficient identifying information, then the data contained in the Exhibits would be as well. Here, with the data contained in the PSA Exhibits, it is the search of the public records, which are wholly extrinsic to the data provided, that allows the property corresponding to each lease to be identified. If volume and page information had been provided, by contrast, the public records would have been explicitly referenced within the writing and thereby incorporated into the agreement. In that case, therefore, extrinsic evidence would have been wholly unnecessary to discern location information. Although the distinction may not be crystal clear in every instance, it is a distinction adhered to in the case law. Preston's position would represent a change to Texas jurisprudence which, as a policy matter, may be advisable, but which has not yet been made.

4

The PSA Exhibits' lack of specific information revealing the location of the leases, combined with its lack of reference to any record or document that would contain such information, is fatal to the writings' statute of frauds validity. Preston notably cites to no authority which has held that the type of descriptive data contained within the PSA Exhibits, absent any indicia as to the physical boundaries or location of the property to be conveyed, is sufficient under the statute of frauds. As such, this Court declines to extend statute of frauds jurisprudence in the manner that Preston suggests. Accordingly, it reaffirms its previous holding that the Exhibits to the PSAs do not contain sufficient information to be statute of frauds compliant.

### 2.     The Lease ID Numbers on the PSA Exhibits

Preston also argued, for the first time at trial, that, in addition to descriptive data, the PSAs contain a unique lease identification number in the far left column under the heading "Lease ID," which corresponds to a file maintained by Preston in the ordinary course of business. (Tr., vol. 1, March 22, 2010, 30:10-21, 195:5-25.) According to Preston, each uniquely numbered lease file contains either a hard copy of the lease itself, which in turn contains a metes and bounds description of the property to which it pertains, or a data sheet bearing a legal description of the tract. (*See* Pl. Br., Doc. No. 133, at 20-21 (citing to the record).) Preston avers that the location information contained within these lease files is incorporated into the PSAs by way of the Lease ID numbers listed on the PSA Exhibits.

The Court, however, is unpersuaded that these Lease ID numbers serve to render the PSA Exhibits statute of frauds compliant. Indeed, before extrinsic testimony was offered at trial, it was not apparent to this Court from looking at PSA Exhibits to what the

"Lease ID" number referred. There is nothing in the PSAs themselves or in the Exhibits attached thereto that gives any indication that these Lease ID numbers refer to files maintained by Preston at their offices. Accordingly, Chesapeake is correct that "Lease ID" does not explicitly refer to another existing writing, but rather "requires parol evidence before it can be understood to mean anything." (Def. Resp., Doc. No. 135, at 15.) In other words, a person could not, upon examining the PSAs and the attached Exhibits, appreciate that the Preston files, and the location data contained therein, were being incorporated into the terms of the agreement. Consequently, the Court cannot conclude that the PSAs may be rendered statute of frauds compliant by the number that is assigned to each lease, because this number requires extrinsic testimony or evidence before its significance can be ascertained.[3]

### B.     Reference to the Leases

Preston made another argument for the first time at trial as to why the statute of frauds has been satisfied by the information contained within the PSAs.  Specifically, Preston argued that the PSAs specifically refer to the "Leases" to be conveyed, and these Leases were in existence at the time the PSAs were executed and contain sufficient information to determine the exact location of the corresponding properties. Preston maintains that the incorporation of the Leases into the agreement renders it statute of frauds compliant.

This Court disagrees. The word "Leases" does not constitute an explicit reference to a particular document or writing because, as Chesapeake points out, it simply begs the

---

[3] Chesapeake also argues that, even after trial, "there is insufficient evidence of the lease files that Preston wishes to incorporate into the PSAs to create an adequate description of property that existed at the time the PSAs were entered." (Def. Br., Doc. No. 134, at 13.) While this Court is inclined to agree with Chesapeake on this point, it need not conclusively decide this issue because it has held that resort to extrinsic evidence is necessary to determine what "Lease ID" refers to.

6

question of which leases are being referred to, and where these leases may be found. In other words, Preston's argument simply leads us back to the question of whether the PSAs contain sufficient information to identify the leases in question. The identifying information contained in the Exhibits, as discussed above, is insufficient to convey which leases are being referred to because it does not explicitly reference a document or public record containing location information. Although the PSA Exhibits do contain identifying data that are more extensive than that previously considered by Texas courts, the fact remains that a search of extrinsic public records is required to definitively discern the "Leases" to which the writing refers. Moreover, Preston's argument would suggest that, in every conveyance of oil and gas leases, the use of the term "Lease" in the conveying document is all that is required to render the conveyance statute of frauds compliant. The Court cannot accept this unpalatable result, as it would, in essence, dispose of statute of frauds requirements altogether in all leasehold conveyances.

Therefore, the Court concludes that the PSAs and the attached exhibits, as executed, do not contain sufficient information to render the agreement between these parties statute of frauds compliant.

## II.    WHETHER, AS A MATTER OF LAW, THE ASSIGNMENT EXHIBITS COULD HAVE BEEN INCORPORATED INTO THE PARTIES' AGREEMENT

Chesapeake also asks this Court to revisit its previous holding that the Assignment Exhibits emailed to Chesapeake on October 7, 2010, although not attached to the executed PSAs, could nonetheless be incorporated into, and constitute part of, the agreement reached by the parties. This Court previously held that "the Exhibit As to the Assignments are not per se excluded from the agreement, simply because they were not

stapled to the copy of the PSAs when they were physically handed over to Chesapeake." (February 2010 Order at 11.) The Court observed that, if the facts of the case revealed that the Assignment Exhibits sent to Chesapeake via email on the day before the PSAs were fully executed and in response to a request by Chesapeake for the final exhibits and schedules ("Emailed Assignment Exhibits"), were indeed "finalized" documents, then they could, as a matter of law, be incorporated into the parties' agreements. (*Id*. at 11-12; Mem. & Order, March 5, 2010 ("March 2010 Order"), at 3.) Notably, because these Emailed Assignment Exhibits did contain recording information for each of the listed leases, incorporation of these Exhibits into the parties' agreement would presumably render the agreement statute of frauds compliant. However, according to Chesapeake, the Court's holding that the Emailed Assignment Exhibits may have constituted part the agreement was erroneous because it conflicts with both Texas law as well as the terms of the PSAs themselves.

The statute of frauds writing requirement may be satisfied by two or more documents. *Bocchi Americas Associates Inc v. Commerce Fresh Marketing Inc*., 515 F.3d 383, 391 (5th Cir. 2008). While courts in other states have found that several writings may be read together for purposes of the statute of frauds when it appears from their terms that they relate to the same transaction (*see* February 2010 Order at 9-10), under Texas law, an unsigned paper may be incorporated into an agreement only by reference in the paper signed by the person sought to be charged. *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968); *see also Matney v. Odom*, 210 S.W.2d 980, 983 (Tex. 1948) (holding that letters were inadmissible to aid the description of the written contract because there was no reference to the letters in the contract itself); *Gruss v. Cummins*,

329 S.W.2d 496, 500 (Tex. Civ. App.—El Paso 1959, writ ref'd n.r.e.) (holding that statute of frauds is not satisfied by an unsigned document unless the document signed by the person to be charged refers to all writings not so signed).

In its previous order, the Court expressed its belief that, in the modern age of email, a more flexible approach to the statute of frauds should be embraced. Under the Court's conception of such an approach, sending several documents over email prior to the execution of a contract could function in the same way as physically attaching all these documents when the contract was signed, because so sending the documents raises the logical presumption that the documents constitute part of the "package" of information reviewed prior to the signing of the agreement. (February 2010 Order at 12.)

The Court acknowledges that its policy reasoning is immune from neither scrutiny nor dissent. Nonetheless, subject to the necessary factual inquiries that were the subject of this trial, incorporation of the Emailed Assignment Exhibits is permissible in this case even under the strict statute of frauds standard traditionally invoked by Texas courts. As has been noted both by this Court and by Preston, the terms of the PSAs that were signed by both entities do reference additional exhibits and schedules, and indeed the Assignment Exhibits specifically. Section 12(b) of the PSAs states that "this agreement, together with the Exhibits attached hereto *and the Assignment and other documents to be delivered pursuant to the terms hereof*, shall constitute the complete agreement between the Parties . . ." (Pl. Exs. 27, 83, 84 ("PSAs") § 12 (emphasis added).) The Assignment form to be delivered at closing is also attached to the PSAs as Exhibit C, and this Assignment form in turn references the Assignment Exhibits that describe the leases being conveyed from Preston to Chesapeake. Therefore, the PSAs, which were

9

inarguably signed by both parties in this litigation, state in clear terms that the Assignment and other documents to be delivered pursuant thereto constitute the complete agreement between the parties. The Emailed Assignments would, therefore, fall within the parameters of this language if they were indeed the Exhibits to be delivered at closing with the Assignment. Furthermore, the Assignment Exhibits are then explicitly referenced in the Assignment form that is part of the signed agreement. Although the Emailed Assignment Exhibits were not attached to the executed PSAs, these two references clearly constitute the kind of explicit reference that Texas law requires for an unsigned writing to be incorporated into a signed writing.[4] This Court's ruling that the Emailed Assignment Exhibits might have been incorporated into the contract although they were not attached to the PSAs, therefore, was indeed supported by policy considerations, but was also consistent with Texas statute of frauds law.

Chesapeake argues that the PSAs do not sufficiently reference Assignment Exhibits such that they could have been incorporated into the agreement because several provisions within the PSAs state that the relevant exhibits are "attached" to the agreement. (*See* Def. Br. at 9-10.) More specifically, Chesapeake points to Section 12(q)(vii) of the PSAs which states "[t]he Schedules and Exhibits listed in the List of Schedules and Exhibits are attached hereto." (PSAs § 12.) While this provision no doubt makes clear that the PSA Exhibits were only those that were attached to the PSAs when they were signed, this does nothing to change the fact that Assignment Exhibits, while not attached, are contemplated by the language of the PSAs and explicitly referred to by

---

[4] Although Chesapeake repeatedly points out that the Exhibit As to the Assignments were not attached to the PSAs because they would have been "premature to the deal," since the parties had not yet reached an agreement as to which properties were to be conveyed, this argument goes to the factual inquiry that was the subject of trial, rather than to the question of whether, as a matter of law, the Assignment Exhibits sent via email could have been incorporated in to the agreement.

the Assignment form attached as Exhibit C. In other words, the language to which Chesapeake points is in no way inconsistent with Section 12(b) of the agreement, which indicates that the additional documents, to be delivered pursuant to the terms of the PSAs, constitute the whole of the parties' agreement.

Accordingly, the Court reaffirms its previous holding that the Emailed Assignment Exhibits, which contained recording information for the listed leases, were not per se excluded from the terms of the parties' agreement simply because they were not attached to the executed PSAs. The connection between the signed PSAs and the Assignment Exhibits is evident from the writing as required by Texas law, because the PSAs contain an explicit reference to Assignment Exhibits to be delivered at closing. *See Gruss v. Cummins*, 329 S.W.2d 496, 502 (Tex. Civ. App.—El Paso, 1959, writ. ref'd n.r.e.) (holding that parol evidence cannot be used to connect writings for the purpose of satisfying the statute of frauds; the connection must be evident from the writing itself). That Assignment Exhibits were referred to within the text of the PSAs means that, subject to the factual finding as to whether they had come into existence when the parties signed the PSAs—that is, whether the Assignment Exhibits sent to Chesapeake via email on October 7 were the finalized Assignment Exhibits referred to in the agreements—they may have been incorporated into the terms of the parties' agreement.

## III.    CLARIFICATION OF THIS COURT'S PREVIOUS ORDER: THE FINALITY OF THE EMAILED ASSIGNMENT EXHIBITS

The Court is aware that its February 2010 holding may have created some ambiguity concerning the exact parameters of the remaining fact question of the finality of the Emailed Assignment Exhibits. The Court will attempt to clarify this holding in order  more fully to set forth the basis for its ultimate judgment.

The Court used the term "final" with respect to the Emailed Assignment Exhibits to communicate two aspects of the Exhibits about which a fact issue remained. First, the term "final" was used to refer to whether the parties' agreement as to all documents attached to the PSAs could be imputed to the Emailed Assignment Exhibits, that is, whether the signature on the PSAs manifested agreement to the Assignment Exhibit As which were sent via email that same day. Second, the term "final" was used in reference to whether the final Assignment Exhibits had come into existence, that is, whether the Emailed Exhibits corresponded to the Assignment Exhibits referenced within the language of the PSAs, such that they could be incorporated into the agreement under Texas law.

While, in the Court's view, these two aspects of finality were intertwined and closely related, it became clear that, in preparation for trial, the parties each focused on a different aspect of the finality of the Exhibits. Preston, in presenting its case, focused on the first aspect of finality, offering evidence to suggest that, when the PSAs were signed, the parties felt that "they had a deal," as to which properties were to be conveyed from Preston to Chesapeake. Preston further pointed out that the Emailed Assignment Exhibits were materially the same as the Exhibits which were attached to the PSAs, indicating that these Assignment Exhibits did in fact reflect the terms that the parties mutually agreed upon. Thus, according to Preston, Chesapeake's acquiescence to the terms of the PSAs could be imputed to the Emailed Assignment Exhibits, which reflected the final deal to which the parties were agreeing. Preston also argued that the only manner in which the Assignment Exhibits would have changed between the signing of the PSAs and closing was pursuant to the title curative process, which was accounted for within the terms of

the PSAs themselves. Thus, according to Preston, these Assignments were subject to no more material negotiation, other than the changes provided for within the PSA terms.

Chesapeake, on the other hand, focused on the second aspect of finality. Chesapeake thus presented evidence at trial that the Emailed Assignment Exhibits could not have been final, because there were still several material steps to be taken by both Preston and Chesapeake before the creation of a final document which reflected the actual leases to be conveyed at closing. In other words, per Chesapeake, even assuming that the PSAs did reference Assignment Exhibits, the writings to which it was referring had not yet come into existence. Accepting this argument, then, even if the Emailed Assignment Exhibits listed largely the same leases as were listed in the PSA Exhibits, they were not the final Assignment Exhibits reflecting the ultimate conveyance, or what leases would actually be conveyed at closing, and could not, therefore, be incorporated into the agreement. Chesapeake also argued, as to the first aspect of finality, that its acquiescence to the terms of the PSAs could not legitimately be imputed to the Emailed Assignment Exhibits, because, although they were sent immediately before the PSAs were signed, Chesapeake's employees did not review these unsolicited and premature Assignment Exhibits prior to signing the PSAs.

The Court will consider both aspects of finality in reaching its conclusion as to whether the Emailed Assignment Exhibits may be incorporated into the agreement that was reached by the parties. The Court will now set forth certain findings of fact with respect to the agreement between these two parties, and, accordingly, reach a final conclusion as to whether the PSAs are enforceable and Preston is entitled to specific performance of the terms contained therein.

IV.     FINDINGS OF FACT

At issue are three Purchase and Sale Agreements ("PSAs") between Preston as seller and Chesapeake as buyer. (Pl. Exs. 27, 83, 84 ("PSAs")). These Agreements anticipate the purchase of certain oil and gas leases located in Harrison and Panola Counties, Texas. (*Id.*) The parties began discussing a proposed assignment of oil and gas leases in June of 2008, when Chesapeake's Chief Executive Officer, Aubrey McClendon, contacted Preston's owner, Art Preston, to discuss a potential transaction. (Pl. Ex. 5, Def. Ex. 2.) During these discussions, Preston expressed a desire for the deal to be done "fast." (Pl. Ex. 6.) On June 20, 2008, the parties signed a Letter of Intent ("LOI") to memorialize their intention to enter into a transaction. (Pl. Ex. 39.) Pursuant to the terms of the LOI, the closing of the transaction was originally scheduled to take place on August 20, 2008. (Pl. Exs. 8, 39.)

The first draft of the PSAs was provided by Preston to Chesapeake on July 2, 2008. (Pl. Ex. 37.) The Prospect Information for the leases to be conveyed was sent to Chesapeake on August 18, 2008. (Def. Ex. 4.) Over the course of the next few months, during which the parties conducted due diligence with regard to the leases to be conveyed, the closing date for the transaction was postponed. First, due to Preston's encounter with a tax issue, the closing date was moved to mid-September 2008. (Ronald G. Getzler Dep., Def. Ex. 189, 39:16-19, January 7, 2010; Tr. 1 23:3-10.) Thereafter, the closing date was again moved to October 7, 2008 to allow due diligence to continue. The record reflects that, while Chesapeake requested the delay, all parties to this transaction understood this second delay to be necessary in light of the apparent pace of the due diligence process. In September 2008, Preston asked Chesapeake how the Assignment

14

form would be generated, and what information Chesapeake wanted in the "Exhibit As."
(Pl. Ex. 16.)  On October 3, 2008, the parties conferred as to allocated values that would
be apportioned to certain leases included in the PSA exhibits. (Def. Exs. 58, 59, 64, 65,
66.) The parties also discussed how the "Exhibit As" to the PSAs would be generated.
(Def. Exs. 60-63.)

On October 6, 2008, Chesapeake requested that the closing date be postponed
once again until November 7, 2008. In exchange for this delay, Preston required a ten
percent non-refundable deposit, amounting to approximately $11,000,000. (Getzler Dep.
40:25-41:4; Tr. 1 69:10-70:6; Def. Br., Doc. No. 132, at 12.) On October 7, 2008, Preston
sent Chesapeake a final version of the PSAs, including the new closing date of November
7, 2008, and an extension of the deadline for Chesapeake to complete the due diligence
process until October 14, 2008. (Pl. Ex. 22; Def. Ex. 76.) Mr. Rudy Sims, Acquisition
Manager of Chesapeake, then informed Preston that he was agreeable to the changes
reflected in the PSAs, but that he needed some time to review the "various schedules and
exhibits." (Pl. Ex. 22.) He went on to write that "he had not seen the final ones yet." (*Id.*)
Preston sent Mr. Sims a set of PSA Exhibits and a set of Assignment Exhibits in series of
emails that afternoon. (Tr. 1 80:8-20, Tr., vol. 2, March 23, 2010, 450:5-10.) Later, Mr.
Sims forwarded to Michael Falen, supervisor of acquisitions for Chesapeake, the final
PSAs with the new closing date, and asked him to review the agreement as well as the
exhibits and schedules "being sent in a separate email." (Pl. Ex. 25.)

At the time when Mr. Sims was forwarded both the PSA Exhibits and the
Assignment Exhibits, his focus and concern were on the PSA Exhibits. (Tr. 2 450: 11-
24.) At that stage, Mr. Sims was concerned with the "value" of the deal, or the amount of

net acreage that he was acquiring. (*Id.* 451:4-12.) In requesting the final exhibits and schedules from Preston, Mr. Sims did not expect to receive Assignment Exhibits, and had never before considered Assignment Exhibits at that point in a land transaction. (Tr. 2 450:13-24.) Mr. Falen testified that he never got to the point of reviewing or approving the Assignment Exhibits. (Tr., vol. 3, March 24, 2010, 573:11-14; 579:4-13.) Chesapeake's position was that, at the point at which the PSAs were being signed, the parties were not yet far enough along in the due diligence process to generate exhibits to the Assignments. (Tr. 2 253:2-9; 472:21-473:17; 568:4-6.) Mr. Sims testified that final Assignment Exhibits "could not have been done at that point." (*Id.* 475:20-476:1.) Preston admits that there may have been defects in the Assignment Exhibits as sent on October 7, 2008, and that these exhibits were not identical to the PSA Exhibits. (Tr. 1 157:17-20.)

Chesapeake then requested a few changes be made on the PSA Exhibits, including use of a different format and correction of a minor mathematical error. (Tr. 1 88:10-25.) Preston signed the PSAs later that day, October 7, 2008, and forwarded the signed PSAs to Chesapeake. (*Id.* 89:1-3; Def. Exs. 83-85.) These agreements, as executed by Preston, were attached to the finalized PSA Exhibits but did not include the Emailed Assignment Exhibits. (*Id.*) On the morning of October 8, 2008, Mr. Bo Blue, a Gulf Coast land manager for Preston who was heavily involved with the Chesapeake deal, sent replacement pages for certain PSA Exhibits to Chesapeake. (Def. Exs. 86, 87.) Mr. Blue later sent another email to Chesapeake entitled "Exhibits," in which he stated that "he hoped this was everything." (Def. Ex. 89.) Attached to this email were only the PSA Exhibits. (*Id.*) After receiving this email from Mr. Blue, Chesapeake executed and

returned the signature pages to the PSAs on the afternoon of October 8, 2008. (Def. Ex. 91.) At the point at which the PSAs were executed, Chesapeake believed that a deal had been made and that they were going to acquire the leases from Preston. (Tr. 2 467:5-24; Tr. 3 594:10-595:3.)

Section 2 of the PSAs imposes a requirement upon Preston to extend leases due to expire less than one year after September 26, 2008, or the effective date of the Assignments. (PSAs § 2.) Preston testified that, as of immediately before the closing date in November, there were at least a few leases set to expire on or before September 26, 2009 that could not be extended by production. (Tr. 1 117:4-118:23.) Section 6 of the PSAs sets forth a title curative process by which to address concerns about Preston's ownership or title to the Leases contained in the PSA Exhibits raised over the course of due diligence. (*Id*. § 6.)

On October 14, 2008, Chesapeake sent three letters to Preston asserting claims of title defects with respect to leases listed in the PSAs. These title defects pertained to 45 of the leases to be conveyed pursuant to the PSA terms. (Pl. Ex. 28; Def. Exs. 107-111.) In addition, Chesapeake pointed out that, because PEC Partnership had not yet been assigned record title to the leases, the initial defect would be the purchase price in the amount of $101,111,270.36. (Def. Ex. 107). Preston responded to these defects in a succession of letters. (Def. Exs. 125, 130, 131, 138, 144, 145.) With regard to the asserted defect due to lack of record title for PEC Partnership, Preston stated that Chesapeake "would be given a copy of the Assignment from Preston Exploration Company, L.P. into PEC Partnership at closing on November 7, 2008." (Def. Ex. 131.)

On November 5, 2008, Bo Blue sent revised Assignment Exhibits to Rudy Sims, advising him that a number of leases had been removed from the exhibits because they would expire before September 26, 2008." (Def. Ex. 140.) Around this time, Preston also sent closing statements to Chesapeake, which anticipated price adjustments pursuant to both title defects and the inability of Preston to extend certain leases beyond September 26, 2009. (Def. Exs., 134, 139, 149; Pl. Ex. 99 at 085-086.) Later, on April 27, 2009, Preston provided Chesapeake with a summary of its responses to all asserted title defects. (Def. Ex. 165.) In its April 27, 2009 summary letter, Preston reported its position that the total price adjustment arising from title matters raised pursuant to the title curative process was approximately $66,000. (Pl. Ex. 99; Tr. 2 515:1-8.)

On November 3, 2008, Chesapeake inquired as to whether Preston would accept an amount of Chesapeake stock in lieu of the cash payment it was to receive on November 7, 2008. (Def. Ex. 132; Tr.  1 111:12-21.) Due to difficulty in scheduling a meeting, this option was not fully discussed between the parties. (Pl. Ex. 31.) On November 6, 2008, Chesapeake informed Preston that it would not be attending the closing scheduled for the next morning. (Def. Ex. 150.) Preston then filed this suit against Chesapeake on November 10, 2008. (Doc. No. 1.) The filing of this suit ended all negotiations between the parties.

## V.      CONCLUSIONS OF LAW

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest, costs and attorneys' fees.

The PSAs, as executed on October 8, 2008, and the exhibits attached thereto, did not satisfy the statute of frauds because they did not "furnish within [themselves] or by reference to some other existing writing, the means or data by which the land to be conveyed may be identified with reasonable certainty." *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972).

The Emailed Assignment Exhibits that were sent to Chesapeake on October 7, 2008, the day before the PSAs were fully executed, cannot be incorporated into the parties' agreement. The evidence produced at trial revealed that these Exhibits were not finalized documents. The parties did not, upon signing the PSAs, agree to the terms of these Exhibits. Chesapeake reasonably believed that these Exhibits were premature, and therefore did not review them prior to signing the PSAs. Thus, there was no meeting of the minds with respect to these Exhibits such that they can constitute a reflection of the final terms of the parties' agreement. *See Findley v. Hundley*, 252 S.W.2d 958, 962 (Tex. Civ. App.—Dallas 1952, no writ.) (holding that the minds of the parties must meet with respect to the subject matter of the agreement and all of them must asset to the same thing at the same time). The parties' agreement as to the terms of the PSAs could not, therefore, be imputed to the Emailed Assignment Exhibits.

In addition, the due diligence process which took place after the PSAs were signed included more than an investigation into whether or not Preston actually owned the leases included in the PSAs. The process included a means by which Preston was required to extend certain leaseholds past September 2009. In addition, as late as November 5, 2009, the leases that would appear on the final Assignment Exhibits were being adjusted pursuant to the title defects asserted by Chesapeake as well as the lease

extension process which took place under Section 2 of the PSAs.  Because of the nature of the due diligence process which remained ongoing after the PSAs were signed, the changes being made to the final list of leases to be conveyed from Preston to Chesapeake was changing rapidly. Thus, the Assignment Exhibits sent to Chesapeake via email on October 7, 2008 were not the Assignment Exhibits referenced within the terms of the PSAs, because these final Assignment Exhibits reflecting which leases were to be conveyed had not yet come into existence.

Accordingly, the Emailed Assignment Exhibits, and the volume and page information contained therein, can not be considered part of the agreement that had been reached and executed by the parties on October 8, 2008. Therefore, the PSAs entered into between Preston and Chesapeake are not subject to specific performance.

## VI.    WHETHER CHESAPEAKE  IS ENTITLED TO A RETURN OF ITS DEPOSIT

Although very little was presented at trial as to this issue, the parties argue in their post-trial brief the issue of whether, if the PSAs are unenforceable as violative of the statute of frauds, Chesapeake is entitled to the return of the $11,000,000 deposit monies paid to Preston in exchange for an extension of the closing date.

Chesapeake's request for this return is based primarily on a theory of unjust enrichment. When a party has been unjustly enriched by the receipt of benefits in a manner not governed by the contract, the law implies an obligation upon the enriched party to restore the benefits to the other party. *Burlington Northern R. Co. v. Southwestern Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), *aff'd* 966 S.W.2d 467 (Tex. 1998) (citing cases). This includes situations in which a contemplated agreement is unenforceable, impossible, thwarted by mutual mistake, or

void for other legal reasons. *Id*. Chesapeake argues that it paid $11,000,000 in deposit monies for which it received nothing, because the assignment was never completed and the PSAs were not enforceable agreements. Accordingly, argues Chesapeake, it should be entitled to the return of the deposit money. Preston responds that the $11,000,000 was consideration paid for the extension of the closing date from October 7, 2008 to November 7, 2008, and is accordingly non-refundable (Tr. 2 455:6-11; 493:1-495:4).

The Court acknowledges that, because the PSAs have now been held not to be subject to specific performance, Chesapeake was under no obligation to close the deal and therefore, on one view, received nothing of legal value for the paid deposit. Nonetheless, the Court also notes that the trial record unambiguously reflects that, as of October 6, 2008, Chesapeake believed that it had an enforceable agreement with Preston which obligated it to close the next day. Thus, Chesapeake paid this money to Preston with the understanding that it was being granted an additional 30 days to shore up funds, conduct due diligence, and close the transaction. The amended PSAs that were signed by both parties reflected this amended closing date.

Although Chesapeake ultimately took the position that the PSAs were unenforceable, at the time the consideration was paid, it did, in fact, receive something in return, namely an additional 30 days in which to investigate the deal and to reach its ultimate conclusion that it had no obligation to close. Had this 30-day extension not been granted, therefore, Chesapeake presumably would have moved forward with the closing the day after signing the PSAs, as originally contemplated by the terms of the agreement. It is not the case, therefore, that Chesapeake, as a practical matter, received nothing for the deposit monies paid—Chesapeake admits that this money was paid in exchange for a

30-day extension on the closing date of the agreement, and this is precisely what they received. (Def. Br., Doc. No. 102, at 12). In essence, Chesapeake bought a 30-day option on a very large oil and gas acquisition agreement. If the economy—and, in particular, the price of oil and gas—had moved in a different direction, Chesapeake would conceivably have held Preston to the terms of the deal even if Preston had received higher offers from other potential purchasers.[5] Thus, Chesapeake was able, for 30 additional days, to prevent Preston from considering other, and potentially higher, purchase offers for the leases in question, all the while maintaining the ability to back out of the deal though asserting the unenforceability of the agreements. This is, in essence, an exclusive option, which Chesapeake received in exchange for $11,000,000.

Accordingly, the Court cannot hold that Preston has been unjustly enriched by receiving the deposit from Chesapeake. This conclusion finds further support in the number of times that closing was postponed and the amount of time and energy on the part of both Preston and Chesapeake that went into executing the due diligence process and preparing this deal for final closing in November. Moreover, the record reflects that Chesapeake relinquished these funds pursuant to an understanding that they were "non-refundable," a term that connotes that the money is not be returned even if Chesapeake is unsatisfied or the deal does not go forward as planned. Accordingly, the Court now exercises its equitable power to deny Chesapeake the return of this $11,000,000.00 deposit.[6]

---

[5] Undoubtedly, Chesapeake's ability in that case ultimately to enforce the agreements against Preston would have been subject to question.

[6] Preston also argues that the money should not be returned to Chesapeake under the theory that Chesapeake has unclean hands. The "unclean hands" doctrine "'closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief . . . .'" *ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 330 (U.S. 1994) (citing *Precision Instrument Mfg. Co. v.*

## VII.    ADDITIONAL ARGUMENTS

Chesapeake argues in its post-trial brief that, even if the PSAs were statute of frauds compliant, the agreements are not enforceable because Preston was not ready to convey marketable title to Chesapeake at the closing. Because this Court has now concluded that the PSAs did not in fact comply with the statute of frauds, it need not reach the merits of this argument. Chesapeake also argues that the PSAs are not sufficiently definite to be enforced because they constitute mere agreements to enter into a future assignment of leases. Again, the Court need not address this newly-raised legal theory at this stage.

Finally, although Preston has pleaded a fraud claim (Pl. Second Am. Compl., Doc. No. 69, ¶¶ 48-51) and seeks damages in pursuance thereof, little to no evidence was presented at trial that would support such a claim. Indeed, at one point in the trial, Preston's counsel affirmatively stated that he had no intention of accusing Chesapeake of fraud. (Tr. 2 328:10-22.) Therefore, the Court cannot conclude that Chesapeake committed fraud in its negotiations with Preston such that Preston is now entitled to an award of damages.

## VIII.    CONCLUSION

To the extent necessary, findings of fact can be construed as conclusions of law, and vice versa. In accordance with the findings of facts and conclusions of law stated above, the Court finds and hold that the Purchase and Sale Agreements at issue are not enforceable agreements. Final Judgment as to Preston's Complaint is hereby **ENTERED**

---

*Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1954)). However, during trial, neither party offered persuasive or conclusive evidence as to whether Chesapeake's actions during the negotiations with Preston demonstrate that they acted fraudulently or in bad faith. Accordingly, the Court cannot, and need not, definitely decide the question of whether Chesapeake did in fact have unclean hands.

in favor of Chesapeake. Judgment as to Chesapeake's counterclaim for restitution for the deposit monies paid is **ENTERED** in favor of Preston.[7]

      **IT IS SO ORDERED.**

      **SIGNED** this 11th day of June, 2010.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[7] The Court would like to note that its decisions throughout the course of this litigation have been extremely difficult. Counsel for both sides have represented their clients in the highest traditions of the Bar, and the Court sincerely appreciates their efforts.