UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PRESTON EXPLORATION COMPANY, LP, *et al.,* § | |
| § | |
| *Plaintiffs*, § | |
| § | |
| v.     § | CIVIL ACTION H-08-3341 |
| § | |
| GSP, LLC*, et al.,* § | |
| § | |
| *Defendants*. § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court is defendants GSF, L.L.C. and Chesapeake Energy Corporations's (collectively, "Chesapeake") motion for new trial and/or to alter or amend judgment (Dkt. 207) and plaintiffs Preston Exploration Company, L.P., PEC Partnership, T.S.C. Oil & Gas, Inc., and Frank Willis, III's (collectively, "PEC") motion for an award of attorneys' fees (Dkt. 208). After considering Chesapeake's motion, PEC's response, Chesapeake's reply, other relevant documents in the record, and applicable law, the court is of the opinion that Chesapeake's motion should be GRANTED, and the amended memorandum and order (Dkt. 199) granting PEC's motion to enter judgment on remand (Dkt. 185) and denying as moot Chesapeake's motion for additional findings of fact and conclusions of law and entry of judgment (Dkt. 190) should be VACATED. Moreover, PEC's motion to enter judgment on remand (Dkt. 185) should be DENIED, and Chesapeake's motion for additional findings of fact and conclusions of law (Dkt. 190) should be GRANTED IN PART. Finally, PEC's motion for attorneys' fees (Dkt. 208)should be DENIED WITHOUT PREJUDICE.

**I. BACKGROUND**

This case relates to the sale by PEC of certain oil and gas leases to Chesapeake. The parties

executed three purchase and sale agreements ("PSAs") relating to these leases on October 7 and 8, 2008. Dkt. 138. The PSAs referenced and incorporated exhibits that had been sent to Chesapeake via email that contained recording information for the leases. Closing was set for November 7, 2008. *Id.* On October 14, 2008, Chesapeake sent three letters to PEC asserting claims of title defects. *Id.* Chesapeake also informed PEC that because PEC Partnership did not have record title to the leases it was to convey, the price adjustment due to this title defect would be the purchase price of the leases in the amount of $101,111,270.26 ("Purchase Price Defect"). *Id.* PEC responded to the defects and, with regard to the assertion that PEC Partnership did not have record title, PEC advised that Chesapeake would be given a copy of the assignment at closing on November 7, 2008. *Id.* PEC sent Chesapeake revised exhibits on November 5, 2008, advising that leases that could not be extended for at least a year, in accordance with the PSAs, had been removed from the exhibits, and detailing anticipated price adjustments. *Id.* On November 6, 2008, Chespeake informed PEC that it would not be attending closing. *Id.* PEC filed this lawsuit on November 10, 2008. *Id.*

The original trial court, after a bench trial, determined that the exhibits to the PSAs were not finalized and that thus there was no meeting of the minds with respect to the exhibits such that they could reflect the final terms of the parties' agreement. *Id.* Thus, the court ultimately held that the PSAs were not enforceable agreements because there was insufficient description of the leases, without the finalized exhibits, to meet the statute of frauds. *Id.* PEC appealed.

In an opinion filed on February 1, 2012, the Fifth Circuit reversed the trial court's finding with respect to the statute of frauds and remanded the case to the district court "for further proceedings in accordance with the opinion of this Court." Dkt. 177. In the opinion, the Fifth Circuit noted that "the trial court's factual finding that the assignment documents [in the exhibits]

2

were not yet final is not disturbed" and that as of the date of closing "there was still some title work to be done before a final determination could be made as to the leases which would ultimately be conveyed." *Id.* Regardless of this lack of finality with regard to the title work, the Fifth Circuit determined that there was a "meeting of the minds as to the subject of the contract," and it ordered that PEC "may obtain specific performance of those leases listed in Assignment Exhibit A of Exhibit C which include recording information." *Id.*

After remand, PEC filed a motion to enter judgment, arguing that the Fifth Circuit had ordered specific performance of the PSAs and that it was "entitled to an order of specific performance requiring Chespeake to deliver to [PEC] the purchase price attributable to the Leases listed in Exhibit 2 and the recaptured 'Carried amount' described in the PSA for PEC Partnership § 2(b), less the 10% deposit previously paid pursuant to PSA § 2(a), ('Remaining Purchase Price') and ordering [PEC] to deliver the Assignment, Bill of Sale and Conveyance documents described above upon confirmation of receipt of the Remaining Purchase Prices." Dkt. 185. PEC also asserted that it was entitled to pre-judgment interest, post-judgment interest, costs, and attorneys' fees. *Id.*

Chesapeake opposed PEC's motion, noting that the Fifth Circuit remanded for further proceedings and that "on remand the Court must determine the extent to which the leases identified in the PSAs survived the rigorous title defect procedure that the PSAs required before an assignment would occur." Dkt. 188. PEC argued, in reply, that Chesapeake made all of its argument about title defects at trial and on appeal and that the Fifth Circuit still ordered specific performance—for the leases for which recording information existed. Dkt. 189. PEC contends that "[a]ll that remains for this Court to do on remand is implement the Fifth Circuit's mandate to enter Judgment granting 'specific performance of those Leases.'" *Id.* (quoting the Fifth Circuit Opinion (Dkt. 177) at 9-10).

3

After the round of briefing on PEC's motion for entry of judgment, Chespeake filed a motion for additional findings of fact and conclusions of law and entry of judgment. Dkt. 190. Chesapeake noted that the Fifth Circuit specifically stated that "[i]t was clearly the intent of the parties that the assignments would not be finalized until such time as the title work was complete," and argued that "[n]ow that the Fifth Circuit has confirmed that the PSAs are enforceable under the statute of frauds, the Court must determine whether and when the parties' course of performing [the] procedure [for resolving title defects in the PSAs] triggered Chesapeake's duty to close on any of the subject leases." *Id.* PEC argued that Chesapeake was simply attempting to re-litigate issues that were fully briefed, considered, and disposed of by the Fifth Circuit. Dkt. 194-1. PEC asserted that the mandate rule and the law of the case required the court to order specific performance in conformance with the Fifth Circuit's instructions, which required that Chesapeake purchase the leases with recording information. *Id.* Chesapeake claimed this would be merely "halfway" enforcing the PSAs because specific performance necessarily includes enforcement of the title defect procedure found in section 6 of the contract, and if one applies that section, after applying Chesapeake's deposit, Chesapeake does not owe PEC anything. Dkt. 195.

The court originally determined that the Fifth Circuit ordered specific performance. Dkt. 199. It therefore granted PEC's motion to enter judgment on remand (Dkt. 185) and denied Chesapeake's motion for additional findings of fact and conclusions of law (Dkt. 190) as moot. *Id.* Chesapeake then filed a motion for a new trial, arguing that (1) this court manifestly erred in construing the Fifth Circuit's opinion as ordering Chesapeake to purchase every lease with recording information; (2) this court manifestly erred in ruling that Chesapeake's decision not to attend closing deprives it of its contractual rights under the PSA's title defect procedures and eliminates PEC's

4

proof requirements under the law of specific performance; and (3) due process requires that the court address and resolve the title defects. Dkt. 207. PEC responded that the court's holding was correct because Chespeake breached the PSAs, which were enforceable by specific performance, and noted that Chesapeake was simply re-urging all of the same arguments it asserted at trial, on appeal, and again on remand. Dkt. 209.

## II. MOTION FOR NEW TRIAL

Rule 59 of the Federal Rules of Civil Procedure provides that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Fed. R. Civ. P. 59(a). "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." 11 Wright et al., Federal Practice and Procedure § 2803 (1995). "A motion for a new trial in a nonjury case or a petition for rehearing should be based upon a manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons." *Id.*

The court has re-reviewed the Fifth Circuit opinion remanding this case. The final sentence of the opinion states, "Therefore, this Court holds that [PEC] may obtain specific performance of those leases listed in Assignment Exhibit A of Exhibit C which include recording information." Dkt. 177 at 9-10. The court originally construed this sentence as indicating that the Fifth Circuit had ordered specific performance of all leases in Assignment Exhibit A of Exhibit C that included recording information. *See* Dkt. 199. However, upon reviewing the entire opinion again, the court has determined that the Fifth Circuit meant only that the remedy of specific performance is *available*

5

for the leases listed in Assignment Exhibit A of Exhibit C that include recording information, not that this court must order specific performance. The court arrives at this conclusion for several reasons. First, the Fifth Circuit noted that the trial court's finding relating to the statute of frauds was "[o]f significance to the issues presented in this appeal." Dkt. 177 at 304. The Fifth Circuit then, under the section discussing the relevant terms of the Purchase Sales Agreements ("PSAs"), noted that it would only outline terms of the PSAs that were "pertinent to the statute of frauds issue referenced herein." Dkt. 177 at 4. Then, it discussed Section 1(a)(I), Section 2, Section 8(b)(I), and section 12(b) of the PSAs. *Id.* at 4-5. Notably absent from its discussion of the PSAs is the section allowing for specific performance in case of breach. The Fifth Circuit opinion focuses almost exclusively on the statute of frauds issue. The Fifth Circuit determined that the exhibits, which it considered part of the contract to convey the property, "contain a sufficient legal description to meet the statute of frauds," and that the "PSAs are [thus] enforceable by specific performance." *Id.* at 9. It then noted that enforcement was limited to the leases identified by recording information, but concluded that "[PEC] *may* obtain specific performance of those lease listed in Assignment Exhibit A of Exhibit C which include recording information." *Id.* at 9-10 (emphasis added). The Fifth Circuit did not render a judgment of specific performance in favor of PEC, it remanded to this court "for proceedings consistent with [its] opinion." *Id.* at 10. This court finds that the use of the permissive "may" in the sentence discussing specific performance means that this court *may* award specific performance if the additional proceedings ordered by the Fifth Circuit indicate that specific performance is appropriate. The court, therefore, **GRANTS** Chesapeake's motion for a new trial (Dkt. 207) and **VACATES** its order (Dkt. 199) granting PEC'S motion to enter judgment on remand (Dkt. 185) and denying as moot Chesapeake's motion for additional findings of fact and conclusions

6

of law and entry of judgment (Dkt. 190). PEC's motion for entry of judgment on remand (Dkt. 185) is hereby **DENIED**.

### III. MOTION FOR ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

Chesapeake moves for additional findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52 and 58. Dkt. 190. Chesapeake argues that the Fifth Circuit reversed the original trial court's decision with regard to the statute of frauds, but otherwise affirmed the court's conclusions that the parties had not agreed upon which leases would become subject to assignment under the PSAs' title defect procedure. *Id.* Chesapeake urges the court to enter new findings of fact and conclusions of law with regard to which leases identified in the PSAs would become subject to assignment under the PSAs' title defect procedure. *Id.* PEC argues that Chesapeake is simply attempting to re-litigate issues that were fully briefed, considered, and disposed of by the Fifth Circuit. Dkt. 194-1. PEC asserts that Chesapeake breached the PSAs when it refused to close, that the PSAs were enforceable even though the exhibits were not final, and that PEC has fully complied with the PSAs' title-curative procedures. *Id.*

The court finds that the Fifth Circuit determined only that PEC may obtain specific performance, not that it was entitled to specific performance on all of the leases. The court must make a determination with regard to breach before it awards specific performance. Chesapeake's motion for findings of fact and conclusions of law is therefore **GRANTED IN PART**, in that the court agrees that it must enter additional findings of fact and conclusions of law, but it does not agree with Chesapeake's proposed new findings of fact and conclusions of law. The court's findings of fact and conclusions of law are outlined in the next section of this memorandum opinion and order.

7

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The court makes the following findings of fact and conclusions of law, which supplement the original trial court's findings of fact and conclusions of law, with the exception of the original trial court's conclusion of law that the PSAs did not meet the statute of frauds:

### A. Findings of Fact[1]

1. The leases described in the spreadsheet attached as Exhibit A to each PSA would exclude, under the PSAs, leases that were subject to title defects. Dkt. 188, App. 1 § 6. Section 6 of the PSAs defines a "title defect" as follows:

> "**Title Defect**" means, as of the Effective Date and other than Permitted Encumbrances: (A) any matter that would cause the title to the Properties to fail to qualify as Marketable Title; (B) any matter that reduces the net revenue interest to be conveyed to Buyer as set forth in Exhibit "A"; or (C) any matter that reduces the number of net mineral acres with respect to any Lease from that which is represented in Exhibit "A". . . .

*Id.* § 6.

2. "Marketable Title" is defined in section 6 of the PSAs as follows:

> "**Marketable Title**" means, as of the Effective Date and subject to Permitted Encumbrances, a title that can be deduced from the applicable county, state and federal records and is such that:
> - a reasonable and prudent person engaged in the business of the ownership, exploration, development and operation of oil and gas properties, with the knowledge of all the facts and their legal bearing, would be willing to accept title to the Properties, and
> - the title is free and clear of liens and encumbrances that would reduce, impair or prevent Buyer from receiving payment from the purchasers of production or which would

---

[1] To the extent any finding of fact constitutes a conclusion of law, the court hereby adopts it as such. To the extent any conclusion of law constitutes a finding of fact, the court hereby adopts it as such.

>>materially impair or reduce the economic benefit Buyer could reasonably expect from acquiring the Properties.

*Id.*

3.  Under section 3 of the PSAs, the effective date and closing were set as follows:

>**Effective Date and Closing.** The conveyance of the Properties to Buyer shall be effective as of September 26, 2008 at 7:00 a.m. where the Properties are located (the "**Effective Date**"), and title thereto shall be delivered at the Closing, which shall take place on or before November 7, 2008 (the "**Closing**" or "**Closing Date**") unless extended by the written agreement of the Parties.

*Id.* § 3.

4.  Chesapeake had the right, under the PSAs, to alert PEC of title defects on or before October 14, 2008. *Id.* § 6(c). Any failure to notify PEC of the defect in writing on or before October 14, 2008 would have resulted in a waiver of the defect under the PSAs. *Id.*

5.  PEC could then either dispute the defect or acknowledge the defect. *Id.* § 6(d). If PEC disputed the defect, PEC and Chesapeake were required to negotiate in good faith to resolve the dispute. *Id.* If they could not resolve the dispute, Chesapeake could either waive the defect or the purchase price would be reduced by the amount of the defect and the affected portion of the property would not be conveyed at closing. *Id.* If PEC instead acknowledged the defect, it had the option to cure the defect. *Id.* To cure the defect, PEC had to use commercially reasonable efforts to attempt to cure, and if it cured to the reasonable satisfaction of Chesapeake prior to closing, the purchase price would not be reduced and the affected property would be conveyed at closing. *Id.* If PEC elected to cure post-closing, it had to use commercially reasonable efforts to attempt to cure, the purchase price would be reduced at closing by the amount of the defect, and the affected portion of the property would not be conveyed at closing. *Id.* However, PEC had six months following closing

to attempt to cure, and if it did cure within this timeframe to the reasonable satisfaction of Chesapeake, PEC could then convey the affected property to Chesapeake for the amount that was deducted from the purchase price. *Id.* Chesapeake was required to "reasonably cooperate with [PEC]" and "not take any action that w[ould], or [was] reasonably likely to, prevent [PEC] from being able to cure such Title Defect." *Id.*

6. Under section 9(a) of the PSAs, Chesapeake was not obligated to attend closing or purchase the leases if any of PEC's representations to Chesapeake were not true and accurate, if PEC had not complied in all material respects with the covenants in the PSAs that were required to be complied with prior to closing (as defined in the PSAs—November 7, 2008), or if a suit, action, or other proceeding was pending or threatened on the date of closing. *Id.* § 9(a). If Chesapeake had proceeded to closing on November 7, 2008, and one of these conditions precedent had not been met, it would have waived the condition. *Id.*

7. As noted by the original trial court, Chesapeake sent three letters to PEC asserting claims of title defects on October 14, 2008. Dkt. 138 at 17 (citing Pl. Ex. 28 and Def. Exs. 107-111). The main defect noted was that PEC had not yet been assigned record title to the leases (the Purchase Price Defect). *Id.* (citing Def. Ex. 107).

8. As noted by the original trial court, PEC responded to the defects in a succession of letters, and, with regard to the Purchase Price Defect, PEC stated that Chesapeake "would be given a copy of the Assignment from Preston Exploration Company, L.P. [("PEX")] into PEC Partnership at closing on November 7, 2008." *Id.* (citing Def. Exs. 135, 130, 131, 138, 144, 145, and quoting Def. Ex. 131).

10

9. On October 7, 2008, PEX signed and delivered the assignment of the relevant leases to PEC, thus giving title to PEC. Dkt. 128 at 85:16-25.

10. On November 5, 2008, as also acknowledged in the previous findings of fact and conclusions of law, PEC sent revised assignment exhibits to Chesapeake, noting that a number of the leases had been removed from the exhibits because they would expire before September 26, 2008. *Id.* (citing Def. Ex. 140). PEC also sent closing statements to Chesapeake, which anticipated price adjustments due to the title defects and the inability of PEC to extend certain leases beyond September 26, 2008. *Id.* (citing Def. Exs. 134, 139, 149 and Pl. Ex. 99 at 085-086).

11. On November 6, 2008, PEX, PEC and TSC signed the assignments to Chesapeake. Pl. Exs. 92-93. The PEX to PEC assignment was made effective at 6:59 a.m. on September 26, 2008, and the assignments to GSF or Chespeake were effective as of 7:00 a.m. on the same day. Dkt. 128 at 86:1-6.

12. On November 6, 2008, as noted by the prior court, Chesapeake advised PEC that it would not be attending closing. Dkt. 138.

13. Section 12(p) of the PSAs states:

> <u>Default and Remedies</u>: If the Closing does not occur due to the breach of the Seller, Buyer shall have the right to exercise any and all other remedies available to Buyer at law or in equity including, without limitation, specific performance of this Agreement. If the Closing does not occur due to the breach of the Buyer, Seller shall have the right to exercise any and all other remedies available to Seller at law or in equity including, without limitation, specific performance of this Agreement, Seller and Buyer acknowledge and agree that: (A) that the Properties are unique; and (B) monetary damages will not be adequate compensation for any loss incurred by reason of any breach of obligations described in this Agreement. In addition, each Party hereby waives in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

Dkt. 188, App. 1.

14.     On November 10, 2008, PEC filed this suit against Chesapeake, seeking specific performance. Dkt. 1. This effectively ended all negotiations between the parties. Dkts. 1, 138.

15.     The file stamp on the leases indicates the assignments were actually recorded on April 17, 2009. Def. Ex. 191.

16.     On April 27, 2009, PEC provided Chesapeake with a summary of its responses to all title defects. Dkt. 138 (citing Def. Ex. 165). In this letter, PEC reported that the total price adjustment due to the title matters raised pursuant to the curative process was approximately $66,000. Dkt. 139 (citing Pl. Ex. 99 and Tr. 2 515:1-8).

17.     Upon the basis of the evidence in the record in this case, PSA purchase prices attributable to the leases listed on the PSA exhibits that include recording information on the Assignment Exhibits tendered to Chesapeake, and the recaptured "Carried Amount" described in the PSA for PEC Partnership § 2(b), less the 10% deposit previously paid pursuant to PSA § 2(a) ("Remaining Purchase Prices") are as follows:

    1.     Preston Exploration Company, L.P. PSA         $ 6,571,191.45
    2.     PEC Partnership PSA                           $ 88,528,402.54
    3.     T.S.C. Oil & Gas, Inc. and Frank Willis PSA   $ 5,713,494.43

18.     In compliance with the PSAs, Preston Exploration Company, L.P., PEC Partnership, and T.S.C. Oil & Gas, Inc. and Frank Willis, III have executed and tendered Assignment, Bill of Sale, and Conveyance documents conveying all right, title, and interest in the leases that are covered by their respective PSAs.

**B.     Conclusions of Law**

1.     Chesapeake breached the PSAs when it failed to attend closing on November 7, 2008.

Chesapeake first argues that it would have waived the Purchase Price Defect under section 9(a) of the PSAs if it had attended closing (*see* Dkt. 195 at 6 & n.19), but section 9 deals with whether PEC met the conditions precedent to close as defined in the PSAs on November 7, 2008, which include whether PEC's representations were true and correct, whether it complied with the covenants and agreements in the PSAs, and whether litigation or the threat of litigation was pending. Dkt. 188-1 § 9(a). Chesapeake may argue that PEC failed to comply with all covenants and agreements in the PSAs because it did not comply with § 3 of the PSAs in that it had not recorded the assignments as of the date of closing, but § 3 merely states that the "conveyance of the Properties to Buyer shall be effective as of September 26, 2008 at 7:00 a.m. where the Properties are located . . . and title thereto shall be delivered at the Closing, which shall take place on or before November 7, 2008 . . . unless extended by written agreement of the parties." Dkt. 188-1 § 3. This section does *not* say "marketable title" as defined in the PSAs—i.e. title that has been recorded—it simply says "title." *Id.* The assignments were made effective as of September 26, 2008 on November 6, 2008, so there is no reason that "title"—as opposed to "marketable title"—could not have been delivered at closing. Thus, PEC was in compliance with § 3 of the PSAs.

Chesapeake may also argue that PEC had not complied with the convenants and agreements because it did not show that it had "marketable title" as of closing under § 6(a)(I) of the PSAs. However, in addition to defining "marketable title" as being "a title that can be deduced from the applicable county, state and federal records," section 6(a)(ii), 6(c), and 6(d) provide a title defect procedure that allowed PEC to attempt to cure noticed defects for up to six months after closing. Dkt. 188-1 § 6. Thus, PEC did not fail to comply with the PSAs by not having "marketable title" and thus having all title defects cured on the scheduled date of closing, and Chesapeake's attending

closing would not have resulted in a waiver of the Purchase Price Defect. Accordingly, even if there were no leases to which defects were cured, Chespeake could not refuse to attend closing.

Chesapeake also argues that PEC never "acknowledged" the Purchase Price Defect, and that it therefore did not invoke the cure period. PEC stated, in response to Chesapeake's raising of the Purchase Price Defect, that Chesapeake would be given a copy of the assignment at closing, which Chesapeake contends did not cure the defect as it does not address whether Chesapeake would have record title—and thus "marketable title"–at closing. Dkt 195. Under the PSAs, PEC had to either dispute or acknowledge the defect, and Chesapeake argues that PEC's statement that Chespeake would receive title at closing was not an "acknowledgment" that provided PEC with the right to cure. *Id.* The court finds that PEC's statement that Chesapeake would be given title at closing was clearly an acknowledgment of the defect, as PEC's proposed "cure" was to provide title at closing. If Chespeake was unhappy with that "cure," it was required under the PSAs to "reasonably cooperate with [PEC]" and "not take any action that w[ould], or [was] reasonably likely to, prevent [PEC] from being able to cure such Title Defect." Dkt. 188-1 § 6(d). The court finds that Chesapeake's decision to not attend closing rather than discussing the record title issue was not reasonable cooperation.

2. PEC was ready, willing and able to timely perform on the scheduled date of closing, November 7, 2008. *See DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593 (Tex. 2008) (requiring that a party be ready willing and able to perform on closing date in order to get specific performance). While the assignments were not recorded on November 7, 2008,under section 6 the PSAs, PEC had six months from the date of closing to cure the Purchase Price Defect. Under section 3 of the PSAs, PEC was merely required to be able to provide title at closing, and PEC could have done that. While the court acknowledges that it did take PEC almost six months to record the assignments after the

closing date, this delay does not indicate that PEC would not have recorded title sooner had Chesapeake not breached the PSAs by failing to attend closing.

3. Because PEC was ready, willing, and able to perform on the closing date and Chesapeake breached the PSAs by failing to attend closing, PEC is entitled to specific performance of all the leases for which it has recording information. Upon the basis of the evidence in the record in this case, PSA purchase prices attributable to the leases listed on the PSA exhibits that include recording information on the Assignment Exhibits tendered to Chesapeake, and the recaptured "Carried Amount" described in the PSA for PEC Partnership § 2(b), less the 10% deposit previously paid pursuant to PSA § 2(a) ("Remaining Purchase Prices"), are as follows:

    1.      Preston Exploration Company, L.P. PSA      $ 6,571,191.45

    2.      PEC Partnership PSA      $ 88,528,402.54

    3.      T.S.C. Oil & Gas, Inc. and Frank Willis PSA      $ 5,713,494.43.

4. PEC is entitled to recover pre-judgment interest at the rate of 5% on the sums ordered to be paid in this judgment. *See Arete Partners, L.P. v. Gunnerman*, 643 F.3d 410, 415 (5th Cir. 2011) (noting that there is a floor interest rate of five percent on pre-judgment interest under Texas law); *Am. Int'l Trading Corp. v. Petroleos Mexicanos*, 835 F.2d 536, 541 (5th Cir. 1987) ("[A]n equitable award of prejudgment interest should be granted to a prevailing plaintiff in all but exceptional circumstances."). The amount of pre-judgment interest to which the plaintiffs are entitled, calculated from November 10, 2008 until December 5, 2012,[2] is as follows:

---

[2] PEC submitted calculations for pre-judgment interest as of May 31, 2012, and noted that the daily interest rate adjustments are $900.16 for Preston Exploration Company, L.P., $12,127.18 for PEC Partnership, and $782.67 for T.S.C. Oil & Gas, Inc. and Frank Willis, III. *See* Dkt. 185. Chesapeake did not dispute these figures, so the court relied on them in calculating the pre-judgment interest as of the date of these findings of fact and conclusions of law, December 5, 2012, which is 1,487 days after this lawsuit was filed on November 10, 2008.

    1.        Preston Exploration Company, L.P.:        $ 1,338,537.92

    2.        PEC Partnership:        $ 18,033,116.66

    3.        T.S.C. Oil & Gas, Inc. and Frank Willis:        $ 1,163,830.29

5.    Further, as the prevailing parties, PEC is entitled to recover reasonable and necessary attorneys' fees and costs, and all sums awarded in this case will bear post-judgment interest at the lawful rate. *See* 28 U.S.C. § 1961 (post-judgment interest); Fed. R. Civ. P. 54(d) (setting forth procedures for awarding attorneys' fees and costs); Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon 2008) ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract."). While the parties have provided briefing relating to the amount of attorneys' fees and costs, this information has likely changed due to Chesapeake's motion for a new trial. Thus, the court will determine the amount of attorneys' fees at a later date, after receiving updated briefing.

### V. CONCLUSION

Chesapeake's motion for a new trial (Dkt. 207) is **GRANTED.** The amended memorandum and order (Dkt. 199) granting PEC's motion to enter judgment on remand (Dkt. 185) and denying as moot Chesapeake's motion for additional findings of fact and conclusions of law and entry of judgment (Dkt. 190) is hereby **VACATED**. PEC's motion to enter judgment on remand (Dkt. 185) is **DENIED**, and Chesapeake's motion for additional findings of fact and conclusions of law (Dkt. 190) is **GRANTED IN PART**, and the court hereby **ENTERS** the findings of fact and conclusions of law outlined in Part IV of this memorandum opinion and order. A final judgment in PEC's favor will be issued contemporaneously with this memorandum opinion and order. PEC's motion for

attorneys' fees (Dkt. 208) is **DENIED WITHOUT PREJUDICE**. PEC shall submit an updated memorandum and supporting documentation of its fees and costs to the court within 30 day of the date of this order,[3] and Chesapeake may file a response within 20 days of PEC's submission. No reply will be allowed.

It is so ORDERED.

Signed at Houston, Texas on December 5, 2012.

_____
Gray H. Miller
United States District Judge

---

[3] The court will retain the documentation PEC has provided for *in camera* inspection for consideration once it receives the updated attorneys' fees briefing.

17